Good morning, your honors. May it please the court. I'm Jeffrey Baird, representing Mindy Brewes. I'd like to reserve three minutes for my colleague, Alan Graff, to present a rebuttal, if we get that far. I hope we get to today new evidence submitted to the Appeals Council, the medical evidence in this case establishing disability, and the credibility of this bipolar claimant. Social Security administrative proceedings are inquisitorial in character, and that's very important to remember. At all times, each of the functionaries rendering a decision on the claimant's claim weighs both pro and con, has an independent duty to develop the record, and makes a final choice for or against the claimant. The regulations permit new evidence to be submitted to the Appeals Council, and they're very specific. The evidence has to relate to the time of the ALJ's decision. But other than that, there's no mention of any good cause requirement or anything else. And that's because the Appeals Council doesn't sit as an appellate court would over a prior adversarial proceeding, but rather is one more functionary in this series of inquisitors. So in this case, yes. Kennedy So that's interesting. I appreciate that explanation. We have language, at least in one of our cases, that suggests that whereas the ALJ has strict requirements about making a specific and factual assessment of the evidence and justifying his or her  suggestion, that the Appeals Council is under no such obligation. So in this case, for example, the Appeals Council received the evidence and then, without any explanation, denied relief. So what do we do with that? Do we now have to look at it de novo, or what? Well, the Court has been a little ambiguous on what the Appeals Council has to do. Once the Appeals Council incorporates the evidence into the record and then considers it on merits, the Court has jurisdiction over that entire expanded record. I think the phrase used in the recent Taylor case was the overall record, the bigger record now that includes new evidence. If the Commissioner hasn't provided specific reasons to reject compelling treating source evidence, for example, the Harmon Court said remand for further proceedings, remand under Sentence 4 for an ALJ to look at it. The Ramirez Court, by contrast, said no, we can evaluate it and it's compelling enough to meet the listings. Here, the crucial evidence that came into the Appeals Council was from Dr. D. Melanta, a treating physician co-signed by her nurse practitioner, and the crucial aspect was too many missed days of work. She will miss too many days of work due to bipolar disorder. The treatment has been partially effective but not totally so, and the credibility of the claimant in her subjective claims, she's not malingering, she's got bipolar disorder, she's going to miss too many work days. So that would be enough for any reviewing body, whether it's the Appeals Council or this court, to say combined with the V.E.'s testimony, unskilled work doesn't tolerate more than two months, two days a month of missed work. The V.E. testimony and Dr. D. Melanta's report would establish disability. But if you want a way out as an appellate body, I understand that it would be I'm not looking for a way out. I'm looking for a principle because there's a circuit split, basically, on this new evidence. We've, if anything, gone with the route you've suggested. But as Judge Reimer said in the appropriately named Anks decision, what that puts us in the position of as an appellate court, we're reviewing a record where we've got the ALJ exquisitely, hopefully, explaining in the role you've described, the reasons for rejecting or weighing or discounting or whatever the ALJ has done with the evidence. All we get is a bottom line from the Appeals Council on what you've now said is conclusive evidence which presumably, in your view, would, say, remand for award of benefits. And we're supposed to, as I think Judge Reimer put it, now we're doing the heavy lifting. And that's troublesome. Well, it is a peculiar task. That was what the Eighth Circuit said. But the Tenth Circuit gives good advice, which is that the evidence to the Appeals Council is one more opportunity for the plaintiff to meet the burden of persuasion. And it's an entire act dedicated to liberality, remedial, helpful. It's inquisitorial. The new evidence can be brought in. So it would be a peculiar task for the district court especially, this court even more so. But the Harmon resolution was to remand for further proceedings. I just think that on this evidence, that's not a good use of time. There's been a seven-year wait by Ms. Brews. And she has the V.E. testimony, unskilled work doesn't tolerate missed days. We have the diagnosis and the evidence of the bipolar disorder, the inability to sustain work, too many missed days of work. That's really the problem. But even without the new evidence, the existing evidence in the record was pretty good for the claimant. It's terrible, but it does help explain her case. We have Dr. Jones, and we have Dr. Serino, who made remarkably low global assessments. Now, that isn't exactly the same as a medical source statement function by function, but it does again indicate the medical evidence early on shows bipolar cannot sustain work without missing too many days. You know, both bipolar is used. It seems the more consistent diagnosis, which is not quite the same as bipolar, is depression. True. Depression is easier to treat, apparently. Well, not necessarily. But she has evidence of anxiety, agoraphobia, inability to leave her house, long periods of isolation, and she has evidence of depression. But I'm going with Dr. DeMilanta's overarching view of the entire record. Remember, DeMilanta, in the new evidence, did say she reviewed old Colorado records, as well as her own records, in making her final assessment. So in that sense, she's better than the state agency physicians who had a more limited record to review. Moreover, she has her own clinical findings, her first-hand observations, giving weight to her opinion. But whether the diagnosis of this hard-to-treat longitudinal mental impairment is bipolar or if it's depression and anxiety, the consequences are the same. Too many days missed. And where does the agoraphobia come into it? Well, they defined that. I know. It's a form of anxiety, I take it. I know what it is, and she says it keeps her from basically leaving the house. Right. So is that all part of the package? I think it is part of the package. The credibility of the claimant was established not so much by her own strange and bold bipolar statements, but by the doctors who examined her and treated her, and the nurse practitioners who treated her, including Nurse Lubchenco, Nurse Stamfer, and then, of course, Dr. DeMilanta, Dr. Jones, and Dr. Serino. Under Ryan v. Astru, the physician with a long-term first-hand understanding of the claimant, of the patient, can give credibility to that plaintiff's long-term claims. The part of the problem with the ‑‑ that you're facing in the ALJ's decision is that the ALJ finds your client not entirely credible. And the principal evidence for that, found on page 8 of the ALJ's decision, is that she describes her condition as unchanging. And the medical evidence seems to suggest that her symptoms are waxing and waning, of a waxing and waning nature, is what the ALJ says. As I read the medical reports, there are days when they said, look, she's had a good month. It's been good. She's been able to care for herself. She seems, you know, upbeat. And then the next time she comes in, you know, she's back down. So we're not too surprised by that. But the ALJ finds her not credible because he doesn't think that she's been forthcoming with him about the nature of her disability. Well, she's really not a good witness to herself, to her own condition. That's why it's important to rely on the doctors who've treated her and observed her. They have a better longitudinal objective view of the waxing and waning. But it's fairly extreme waning, isn't it? She drops into these isolation periods where she's stuck in her house and she can't go out. It's not the ordinary ups and downs that somebody treated with mild meds would go through. She has radical shifts, it looks like. So the best evidence comes from the doctors who give her credibility over a longitudinal period. I'll let my colleague do any rebuttal if there are no questions. Good morning. Jordan Goddard, appearing for the Commissioner. And please keep your voice up. Thank you for that reminder. In 1980, Congress amended the Social Security Act in order to reduce the number of remains. They did this by rolling back claimants' procedural rights and allowing or creating a very simple but effective filtering mechanism known as good cause that allows the district court to essentially distinguish between new medical revelations that have come to light after the final decision of the Commissioner has been given from simply ongoing argumentation or rebuttal that could have and should have properly been presented to the administrative law judge. To the, not necessarily the administrative law judge. You've prejudged the argument. As I read that, evidence that could have been presented to the agency. Well, Your Honor, you raise a very important question here. That is the question. Absolutely. The language of the statute refers to a prior proceeding. And the government contends that when understood in context, a proceeding of this nature is an administrative proceeding. This is an administrative implementation that is occurring here. Let's get to the point. The point is, in this case, the Appeals Council accepted the new evidence. The regulations provide for it. The regulations don't have a good cause. So the agency had before it the evidence. This is not brought to the district court. Post-Appeals Council is brought to the district court with the evidence in the record. Okay. It's just without explanation by the Appeals Council as to why it didn't consider it persuasive. But the agency did have it. So why is it in the district court subject to a good cause filter when it wasn't subject to a good cause filter when it was presented to the Appeals Council? There's an important distinction that has to be made between the statutory obligations placed on the district court, or rather placed on the claimant at the district court level, as opposed to the requirements that are imposed by the commissioner upon his own agency through regulation. And an example of that is the difference between the evidentiary standards. Under regulation, for example, when an administrative law judge is making findings of facts, he or she uses a preponderance of the evidence standard. However, at the district court level, the statute comes into play, and on review of those findings, it's a substantial evidence standard. So we give deference to the agency. Well, absolutely. We're deferring to the first line of decision making. So the first line of decision making, the ALJ, is there's a process to go to the Appeals Council, and the Appeals Council just doesn't say, no, you're too late, no good faith, you could have had it before, and so on and so forth. So they have it. Okay? Now that's what's before. That's part of the record. Absolutely. But the question is, was it incorporated into the record in a prior proceeding? It was. In this case, it was. It's part of the record. The Appeals Council didn't reject it. It's part of the record. But the government contends that the Appeals Council's denial of review does not qualify as an administrative proceeding. Okay. So the final judgment was when time for appeals started from the ALJ's ruling? The time for appeal, no. No. Because the final agency action was after the Appeals Council ruling. But the final agency action has to be distinct from an administrative proceeding which is synonymous with a full hearing or a full trial. And I referenced Black's Law Dictionary there. There is a significant difference between the two. The decision that we're reviewing here is not the ALJ's decision. It's the decision of the Commissioner. Now, the Commissioner can decide to have the ALJ do all of his work for him, or he can decide to let the Appeals Council review the ALJ's work. But whatever the process is inside the Social Security Administration, what we're ultimately reviewing is the Commissioner's decision. Did the Commissioner have this evidence before him? Did the Commissioner consider this evidence? The answer to both of those questions is yes, isn't it? The Commissioner's final decision was given by the administrative law judge. And the way the regulation, the Social Security law judge. Then why did we have a proceeding before the Appeals Council? Well, because the Appeals Council does invite argumentation, does invite. But if there was no, was there a chance that the Appeals Council was going to change its mind? Absolutely. They actually do that in about 30 percent of the cases. I understand that the Appeals Council has agreed with the ALJ here, but we're still reviewing the decision of the Commissioner, not the decision of the Appeals Council or the decision of the ALJ. To the extent that those represent the Commissioner's view, that's what we're going to review. Well, I apologize for not having the regulation off the top of my head, because this wasn't specifically brief. But our regulations, which I believe are entitled to deference in this case, define the, actually define the Commissioner's final decision as the ALJ's decision when the Appeals Council has denied review. And so to say that the ALJ's decision is not the, is different from the Commissioner's decision, I think is a distinction without a difference. We have, if you give proper deference to the regulations, we have defined the. And this is a regulation you didn't put in your brief? I apologize. I mean, if there is such a regulation, it might make some difference. But without that regulation, it seems to me patently obvious that we are reviewing a decision of the Commissioner. And as I read section 405G, it says the court may at any time, this is the section you're relying on, the court, is to say us, may at any time order additional evidence to be taken before the Commissioner of Social Security. Additional evidence. The Commissioner already has the evidence that was put in in front of the Appeals Council. But only upon a showing that there is new evidence, that is to say evidence beyond that is which is already in front of the Appeals Council. New evidence, material, and good cause. This is just patently obvious to me that this is directed at a district court or us on appeal saying all of a sudden the claimant is telling us there's new evidence that was never in front of the Commissioner. And for good reason, the statute says we are not supposed to direct new evidence to be shown for as not previously having been advanced. And you're telling me there's a regulation that interferes with that reading, but you haven't put it in your brief. I'm sorry. That I what I'm saying is that our regulations have specifically defined what the Commissioner's final decision subject to judicial review is, and there are. We get that in the immigration context. You know, the immigration judge makes a ruling. It goes to the Bureau, the Board of Immigration Appeals. And if the BIA gives a one-line affirmance, then what we're reviewing is the last in effect, the last reasoned decision of the immigration judge. But, you know, if the BIA goes ahead and opines on it some way, then we review that. So, but in this case, the appeals counsel took the evidence in and then did something with it and then denied. So it goes back, and all we have is the ALJ, plus the evidence that was before the appeals counsel. So presumably they weren't impressed by it. I believe the biggest barrier to that interpretation of the statute comes from the Gomez case, where this Court had previously held that there are no evidentiary findings required to reject an expert opinion. So to pardon my phrasing here, but to impose the fiction that there is a larger adjudication that's occurring, that there's a full trial or full adjudication. That's the problem. That was what I was posing to counsel at the opening. I said, you know, we can't force the appeals counsel to articulate the reasoning that used the way we can with the ALJ. So it is. It's a conundrum. It is. And that conundrum has been. And if the appeals counsel wants to give us some sense as to why it decided what it did, it might actually reinforce its ability to persuade us. All the appeals counsel here have done is say, well, we looked at it. Denied. So I have no idea what they did with this letter that's just been cited to us, in which we are told that there does not appear to be evidence of malingering or exaggerated symptoms. She would miss work. This is the letter jointly signed by Dr. Demalanta and by the nurse practitioner. That was evidence in front of the appeals counsel that they find not persuasive. I don't know why they didn't find it persuasive. Looks pretty good to me. They could have told me why it's not persuasive. That might persuade me, but they didn't say anything. Would you tell me why it's not persuasive? Okay. I was going to ask, do you want me to engage in a little potentially post hoc reasoning here? The reason is because Dr. Demalanta's treatment records were actually in front of the administrative law judge. And what you have here is what amounts to a conflict between the actual treatment records and an opinion that was generated after the doctor. Okay. Point me specifically to what's in the treatment records that is contradictory to and fatal to what the doctor herself says those records show. Yes. On page 456 of the excerpts of record. 456. Hang on. 456. I'm slow, but I'll get there. Okay. I'm on page 456. Yep. She has not followed through on recommendations for the most part. This has to do with her compliance with treatment, which the ALJ brought up as an issue here. That's absolutely a characteristic of depressives, that they don't follow through on recommendations. Well, I think we have to clarify what we're talking about here. One of the issues that has not been raised that's, I think, extremely important is the issue of drug-seeking behavior here. I was a little bit surprised to see Ms. Brew's counsel bring up Dr. Serino's opinion as one that is allegedly supportive of her claim, where in fact their relationship ended in a rather contentious manner once Dr. Serino concluded that there was significant drug-seeking behavior going on. And so you have throughout the record all of Ms. Brew's treatment providers recommending that she reduce her medication use, recommending that she wean off of these addictive medications, to which she is showing medication-seeking behavior. Well, the only addiction that we see that formally characterizes addiction is Percocet. She is, I think, the evidence shows, her treaters do occasionally say medication-seeking, and my God, she's just taking a whole pharmacy every day. I mean, the amount of drugs she's taking is truly staggering. But I'm having trouble seeing how that is inconsistent with the overall evaluation we're getting in this letter that's sent to the appeals, produced for the appeals counsel. Well, again, I submit that you have a plain contradiction. What that's indicative of, if you go to, say, the Nguyen case. I don't want another case. What is the contradiction here on these facts? Well, like I said, in the letter, Dr. DeMolanta says that she is compliant with treatment. Now, where does she say that? I believe it's at the end of 602. Okay. Where? Continue on to 603. Read me the language. I apologize. Counsel, you know, I hope you all take a learning experience. The Court looks at the record. Maybe the appellate counsel doesn't. It's always helpful to have your key documents in front of you. My apologies to the Court. No disrespect intended. No, I didn't take it as disrespect. I took it as a learning experience. Thank you, Your Honor. A teachable moment, as they say. Okay. Right about a third of the way down the page on 602, despite her compliance with medication and therapy, when, in fact, the record repeatedly notes noncompliance with medication. Well, you know, that's not necessarily inconsistent. She is noncompliant to some extent. I went through an awful lot of these records. For the most part, she does seem to be compliant, although from time to time she's not. From time to time she takes more than she should. She says, well, I was having another panic attack, so I took too much, and now I ran out. And this statement here, despite her compliance, it doesn't say despite her consistent compliance. She was, in fact, compliant much, maybe even most of the time. So I don't see this as inconsistent. This is nearly, this is almost two years after Cipriano-Sarr, or Serino, sorry, Serino-Sarr. So, I mean, to say that she's compliant with the medications and therapy in October of 2007 is not contradictory that a prior doctor found her in early 2006, late 2005, not to be entirely compliant and to be medication-seeking. Well, I would, Smith, I do not mean to imply that you're not familiar with the record, but Dr. Serino is just the strongest example where there's actually an end of the relationship between Dr. Serino where Ms. Bruce essentially says, I'm going to find another treatment provider then if you're going to ask me to try to wean off of these drugs. And she repeatedly makes statements that she's not interested in reducing these drugs, whether it's to, I believe, her nurse practitioner or even to... But drug-seeking is a nasty word. Unwillingness to get off of the drug regime she's now on doesn't necessarily mean the same thing as drug-seeking as it is ordinarily used, and I think you're using it. Drug-seeking is typically used by somebody who's trying to run around and get more oxycodone. That she should be unwilling to come off of these antidepressant medications, to come off of her lithium, to come off of her... That doesn't necessarily mean that she's not disabled. It may mean that she's absolutely disabled and she's terrified of getting off of these drugs. I understand what you're saying, although I would point out it's not the antidepressants that have been the issue here. It's actually depressant medication that is used to treat anxiety, and it's well recognized that these sedatives are addictive, maybe not quite as addictive as opiates, but these are not antidepressant medications we're talking about. What the ALJ's factual findings... She's taking both antidepressants and anti-anxiety medications. I'm not myself a doctor, but I've had a fair amount of experience dealing with treatment of depressives and watching it for bipolar and so on. This is an extraordinarily high number of drugs. I'm not sure these doctors are treating her properly. And it may well have been the good advice to get her off of some of these drugs. I don't know. But none of that tells me that she's not disabled. No, Your Honor, you're right. What tells you that she's not disabled is what the ALJ identified as evidence that when she's not in a situation where drugs are on the line, when she has a situation where she goes in for surgery, where her husband goes on a business trip out of the country, she's able to function just fine. You know, he did go on this trip to Israel, and you make a fair point of she's able to function just fine. I looked at the treating records during the period that he was on that trip. Virtually the first day he's on the trip, the doctor reports she's surprised at how well she's doing. But then she comes back in to see the same doctor on about four days later, about five days after that, and she reports extreme distress. So that first, I'm surprised at how well I am doing, looks as though it's on about the first or second day he's on that trip. Well, I would add then that we also have at least one surgery that was performed where she was hospitalized, and her treatment provider specifically noted there were no issues with anxiety and depression. We also have in 2006, there's a notation in the record that she went to a party. And the ALJ, therefore, I think the ALJ's finding that there's substantial evidence in the record that the actual activities that we're seeing from Ms. Brews aren't really consistent with some of these opinions. And when you also take into account the fact that there is the ---- I mean, I don't want to prolong this, but one more point. You say evidence of the party. What's the party you're referring to, and where on the record is this? The party in 2006 is mentioned, excuse me, it's in my credibility. It's at 452. Okay, hang on. Okay, I'm on page 452. Client was the note right in the middle of the page. Client was able to go to a party and engage in daily activities successfully during the week. Presents with a flat effect. Says she feels somewhat depressed, which is consistent as with the observation that was made earlier that there is significant waxing and waning in these complaints. You do have periods, none of which last for 12 continuous months. And then you have to counter it with statements like these where she's somewhat depressed, but she went to a party and is getting along in her activities of daily living. I'm not sure that says that. She did go to the party. Client says she's not changed much, but is feeling better about getting out of her room to be with her dogs and went to a party last weekend. Client indicated, I'm not far out of my shell. Client presents with flat, I'm still on this same page. Client presents with flat affect and states she will often feel somewhat depressed. However, client has made some progress in getting out to do things. She did admit she has changed, quote, a little. So this is, yeah, she's having a good day, good week even. Yeah, she engaged in daily activities successfully during the week. Okay. Got it. Thank you. Good morning. Alan Graff for Appellant. I don't have much to add, but I just did want to mention SSR 111P, which has recently come out. It's a ruling which Social Security doesn't have to go through promulgation to issue. But in SSR 111P, they took away the ability of the claimant to file a second application while the first application was pending. And in the same SSR, they basically reminded the claimant that, well, instead, as consolation, and then re-quoted the regulations, that you can still present evidence to us on your claim that's now pending in front of us. And then citing the same regulations, 404 and 970B, saying if it's new in material, relates to a period on before the date of the hearing. So they repeated in that 111P where they took away the claimant's ability to present to file a new application, you can still present new evidence. Now, the thing that's distinguished in this is that's important. In the footnote, they also stated that they directed that the six states that comprise the Boston region, if you're going to submit new evidence to the AC, you do have to show good cause. So Social Security, the agency, has the ability, through rulemaking without any comment, to impose good cause at any point. And they did in a specific region, but not to the entire country. So they repealed that. Did they repeal it? No, 111P is still in place. I think they've changed some of the procedures in the Boston region. But that they basically showed that they do have the ability to require good cause, but haven't, and only for the Boston region. So they're basically making a promise to the claimant, you can present new evidence, but then here today they're saying, but if you go to district court, we take back our promise. Thank you. Thank you. Thank you. Thank both sides for their arguments. Bruce v. Astor is now submitted for decision. That's the last case on our argument calendar. I know that we've got some law students here in the room. We will conference, and then I think a couple of us will come back out, at least one of us. I think two of us will come back out. But while we're in conference, I gather a couple of law clerks are willing to talk to you. And before we adjourn, I'd like again to thank Mary Ellis. You're not allowed to retire, actually. OK, we're adjourned.
judges: Fletcher, Fisher, Bybee